GILLUM, The WILLIAM. See Case No. 17,693.

---

## Case No. 5,441.

### GILMAN v. BROWN et al.

[1 Mason, 191.] [1]

Circuit Court, D. Massachusetts. May Term, 1817.[2]

UNPAID PURCHASE MONEY — LIEN OF, ON LAND— SHARES IN ASSOCIATIONS FOR PURCHASE AND SALE OF LAND—EFFECT OF.

1. The scrip or certificate holders, in the New England Mississippi Land Company, hold their shares under the company itself, as a part of the common capital stock, and are not considered as holding derivatively, and solely as individual sub-purchasers, under the separate original titles of the original purchasers from the Georga Mississippi Company, so as to be affected by any circumstances of defect in these separate original titles; those titles being in fact now vested in the trustees of the New England Mississippi Company itself, as part of its common stock, and not in the individual holders.

[See note at end of case.]

2. The award of commissioners under the acts of congress of the 31st of March, 1814, c. 98 [2

Story, Laws, 1405; 3 Stat. 116, c. 39], and of the 23d of January, 1815, c. 706 [4 Bior. & D. Laws, 776; 3 stat. 192, c. 24], and of the 3d of March, 1815, c. 778 [4 Bior. & D. Laws, 843; 3 Stat. 235, c. 97], appointed to settle the claims of the New England Mississippi Land Company and others to the "Yazoo Lands" (so called), is not conclusive as between the scrip-holders and the said company, as to their rights, derived under the grants of certificates of shares in the stock of the company itself. The commissioners had no jurisdiction of any such question.

3. The origin and nature of liens on land for unpaid purchase-money. Generally speaking, such a lien exists, as between vendor and vendee, and also as against subsequent purchasers from the vendee with notice, that the money remains unpaid; but not as against a purchaser bona fide without notice. But the rule itself is not inflexible, as between vendor and vendee. And therefore if the parties do any unequivocal act, by which they clearly show that they do not contemplate such a lien to exist, the lien is not permitted to attach. If the vendor take a distinct security for the money, either of property, or of the responsibility of a third person, the lien is waived. But merely taking the note or bond of the vendee himself, without a surety, is no waiver of the lien. If the vendor take a negotiable note of the vendee, endorsed by a third person, payable at future times by instalments, this is such a distinct security as extinguishes the lien.

[Cited in Harris v. The Kensington, Case No. 6,122; Re Brooks, Id. 1,943; Re Perdue, Id. 10,975; Re Bryan, Id. 2,062.]

[Cited in Williams v. Roberts, 5 Ohio, 41. Disapproved in Graves v. Coutant, 31 N. J. Eq. 770. Cited in Re Palmer, 1 Dong. (Mich.) 428; Boos v. Ewing, 17 Ohio, 520; Tobey v. McAllister, 9 Wis. 469; Boynton v. Champlin, 42 Ill. 65; Adams v. Buchanan, 49 Mo. 64; Anderson v. Donnull, 66 Ind. 156; Messmore v. Stephens, 83 Ind. 527; Clower v. Rawlings, 9 Smedes & M. 122; Walton v. Hargroves, 42 Miss. 18; Baum v. Grigsby, 21 Cal. 178; Dunton v. Outhouse, 64 Mich. 425, 31 N. W. 413; Marshall v. Christmas, 3 Humph. 618; Kauffelt v. Bower, 7 Serg. & R. 78; Schnebly v. Ragan, 7 Gill. & J. 122; Chapman v. Chapman (Ark.) 18 S. W. 1037.]

[See note at end of case.]

4. Quaere. whether on a purchase of lands, lying in another state, made under a contract executed in Massachusetts by citizens of that state, a lien for the purchase-money vests in favor of the vendors, who are citizens of the state where the lands lie, the contract being silent on that head, and no such lien existing by law in any case of the purchase of lands in Massachusetts. A lien is always supposed to exist by the tacit consent of all the parties. Can such consent be presumed where the law of the state is not known to the purchasers in another state?

[Cited in Burrows v. Hannegan, Case No. 2,206.]

[See note at end of case.]

[Cited in Dow v. Rowell, 12 N. H. 59; Ahrend v. Odiorne. 118 Mass. 265; Snyder v. Martin, 17 W. Va. 301.]

5. A lien is neither a jus ad rem, nor a jus in re; and the lien of a vendor on the land sold is so mere a creature of the court of equity, that its existence cannot be safely predicated in any case, until established by the decree of the court. Quaere, whether commissioners under the acts of congress aforesaid, had any jurisdiction to inquire into or settle any claim for a mere lien.

[Cited in Dunlap v. Stetson, Case No. 4,164; Fletcher v. Morey, Id. 4,864.]

---

[3] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by William P. Mason, Esq.]

[2] [Affirmed in 4 Wheat. (17 U. S.) 255.]

[In equity. Bill by Mary Gilman against Samuel Brown and others.]

This cause was by consent heard upon the bill, answer, and exhibits in the case. There were no facts in dispute between the parties; and the whole controversy turned upon questions of law. The material facts were these: In the month of January, 1796, sundry persons, and among them William Wetmore, purchased of the agents of certain persons in Georgia, called the "Georgia Mississippi Company," then in Boston, a tract of land, then in the state of Georgia, and now in the Mississippi territory, estimated to contain 11,-380,000 acres, at ten cents per acre; which tract the Georgia Mississippi Company had purchased of the state of Georgia, and had received a grant thereof in due form of law. The conditions of the purchase were, that the purchase-money should be paid as follows, viz. two cents thereof on or before the first day of May, 1796; one cent more on or before the first day of October, 1796; two and a half cents more on or before the first day of May, 1797; two and a half cents more, on or before the first day of May, 1798; and the remaining two cents on or before the first day of May, 1799. The whole of the purchase-money was to be secured by negotiable notes of the several purchasers with approved endorsers, to be made payable to Thomas Cumming, president of the Georgia Mississippi Company or order, payable at the Bank of the United States at Philadelphia, or at the Branch Bank of Boston, and to be delivered to the agents upon the execution of the deed of conveyance by them. It was further agreed, that the deed, when executed, should be placed in the hands of George R. Minot, Esq., as an escrow, to be delivered over by him to the grantees upon the first payment of two cents payable in May, 1796, for which first payment, and for that only, the purchasers agreed to hold themselves jointly responsible. Accordingly, a deed of conveyance was executed by the agents dated the 13th day of February, 1796, to certain grantees named by the purchasers, to wit, William Wetmore, Leonard Jarvis, and Henry Newman, in trust for the purchasers; and the same was duly placed in the hands of Mr. Minot, as an escrow, and negotiable notes with approved endorsers were duly delivered to the agents by all the purchasers for their respective shares of the purchase-money. And afterwards, the first payment of two cents having been satisfactorily made to the agents, the said deed was, with their consent, delivered over to the grantees as an absolute deed; and a deed of confirmation thereof was afterwards, in February, 1797, duly executed and delivered to the grantees by the Georgia Mississippi Company. After the purchase, and before the delivery of the deed, the purchasers formed themselves into an association by the name of the New England Mississippi Land Company, and executed sundry articles of agreement, and, among other things, therein agreed, that the deed of the purchase should be made to Jarvis, Newman, and Wetmore, as grantees as above stated (article 2); that they should execute deeds to the several original purchasers for their proportions in the lands, but should retain these deeds, until the purchasers should sign and execute the articles of association; and should also execute a deed of trust, to certain trustees, as provided for in the articles, of such their respective shares in the purchase (article 3); that the several purchasers should execute a deed of trust to Jarvis, Newman, and William Hull, of their respective shares in the purchase, to hold to them and the survivor of them in trust, to be disposed of according to the articles (article 4); that the business of the association should be managed by a board of directors, who were to have full power and authority to sell and dispose of the whole or any part of the property of the company, and to pay over to their respective proprietors their proportions of the money received from any and every sale, &c., (articles 8, 16, 20); that upon receiving a deed from any purchaser according to the tenor of the articles, the trustees were to give to each proprietor a certificate, in a prescribed form, stating his interest in the trust, and that he should hold it according to the articles of the association; which certificate was to be recorded in the company's books, and was to be "complete evidence to such person of his right in said purchase," and was to be transferable by endorsement; and, upon a record of the transfer in the company's books, the transferee was to be entitled to vote as a member of the company. The share of Mr. Wetmore in the purchase was 900,000 acres. He paid the two cents per acre in cash; and of the notes given by him for the purchase-money, $40,000 were paid by Mrs. Sarah Waldo, his endorser, and the residue $45,000 still remains unpaid. Mr. Wetmore received his certificates from the trustees for his whole purchase, and having sold or conveyed 500,000 acres, he afterwards conveyed the remaining 400,000 acres to Robert Williams, to whom certificates for that amount were duly issued by the trustees, three of which certificates each for 20,000 acres, duly endorsed by said Williams, came into the plaintiff's hands for a valuable consideration; and, the assignment thereof having been duly recorded in the company's books, she was admitted, and has always acted as a member of the company. From causes which are perfectly well known to the public, the New England Mississippi Land Company never obtained possession of the tract of land so conveyed to them.[3]

On the 31st of March, 1814, congress passed an act entitled, "An act providing for the

---

[3] See the history of this case in Fletcher v. Peck, 6 Cranch [10 U. S.] 89, and in the public documents of congress, 1809.

indemnification of certain claimants of public lands in the Mississippi territory." [3 Stat. 116.] By this act and other subsequent acts amending the same.—Act Jan. 23, 1815, c. 706 [3 Stat. 192, c. 24]; Act March 3, 1815, c. 778 [3 Stat. 235, c. 97],—it was provided, that the claimants of the lands might file in the office of the secretary of state, a release of all their claims to the United States, and an assignment and transfer to the United States of their claim to any money deposited, or paid into the treasury of Georgia, such release and assignment to take effect on the indemnification of the claimants according to the provisions of the act. Commissioners were to be, and were accordingly, appointed under the act, who were authorized to adjudge and determine upon the sufficiency of such releases and assignments, and also to "adjudge and determine, upon all controversies arising from such claims so released as aforesaid, which may be found to conflict with, and to be adverse to, each other." And the sum of $1,550,000, to be issued in public stock, was appropriated by the act, to indemnify the claimants, claiming in the name of, or under, the Georgia Mississippi Company. The New England Mississippi Land Company duly executed the release and assignment, required by the act of congress; and presented the claims of the whole company before the commissioners. The commissioners awarded the company the sum of $1,083,812 in stock, certificates for which were duly issued under the act of congress, and received by the treasurer of the company. A farther claim was made for the whole amount of the original share of Mr. Wetmore, but the board of commissioners decided, that the Georgia Mississippi Company had a lien in equity on the land sold and conveyed to said Wetmore, for the purchase-money due and unpaid by said Wetmore, and that the indemnity under the act of congress should follow that lien, and be awarded to said Georgia Mississippi Company to the amount thereof. And inasmuch as the said Sarah Waldo was the holder of certain certificates issued by said trustees, on account of said Wetmore's original purchase, the commissioners further awarded, that the sum of $40,000 of the purchase-money (which had been paid or satisfied by her for said Wetmore, or her endorsement) should be applied first to make good the scrip or certificate so issued to her; and that if there was any surplus after making her scrip or certificates good, such surplus could not be applied to the scrip or certificates held under Robert Williams, who did not become the assignee of the said Wetmore until after the said sum was paid. And the commissioners further decided, that the certificates, issued by the trustees on account of any of the original purchasers, who failed to make payment of the purchase-money to the Georgia Mississippi Company, were bad, and that the par-

ties claiming under them must lose their indemnity under the act of congress. By this award of the commissioners, the claim of the New England Mississippi Land Company for the amount of the share of the plaintiff was completely excluded. But the plaintiff claimed her share of the stock actually received, as a proprietor in the New England Mississippi Land Company, notwithstanding the award of the commissioners, and to establish this claim, the present suit was brought; and in her bill she averred, that she was a bona fide purchaser for a valuable consideration, without notice of the nonpayment of the purchase-money by Mr. Wetmore, which averment was not denied by the answer.

Mr. Webster, for defendants.

The plaintiff comes into court as the holder of an equitable interest only. The legal estate was vested by the conveyances in trustees, and William Wetmore, from whom the plaintiff's title is derived, was entitled to nothing but the benefit of the trust. The title, therefore, is no better in the plaintiff's hands, than it was in the hands of William Wetmore. The purchaser of an equity must abide by the case of the person from whom he buys. He must take the estate subject to all incumbrances. Want of notice, or payment of a valuable consideration, will not enable him to raise himself higher than his vendor. Lord Thurlow says (Davies v. Austen, 1 Ves. Jr. 247) he takes that to be a universal rule. See, also, Mackreth v. Symmons, 15 Ves. 329, and Sugd. (2d Lond. Ed.) 482. Holding the title of Wetmore subject to all the equity which belonged to it in his hands, the question is, whether the plaintiff can claim any portion of this fund? A sufficient answer to this claim is, that she has contributed nothing to the fund. She wishes to partake in the benefit, without having partaken in the burden. She may indeed have paid a valuable consideration to Wetmore, or his assignee of whom she purchased; but that payment has not gone into this fund, and gives her no equity against these defendants. She is the representative of Wetmore's right, and as far as any thing was paid on that right, so far an allowance has already been made by the commissioners under the act of congress, to those whom they thought entitled to receive it. For what remains, she can be entitled to nothing, because, as to this, the right which she represents has paid nothing. It has been urged, that the New England purchasers intended to incorporate their several titles and estates into one common estate, and out of this to carve new portions for the several purchasers, according to the amount of their original interest, but entirely disregarding the quality of their original titles. If this had been so, it would not help the plaintiff's case. Wetmore, as well as the others, had covenanted for title, and could not be permitted, in a court of equity, to claim

against those covenants the benefit of a conveyance, which turns out to be inoperative and unproductive, as far as he was concerned in it, on account of his violation of the covenants of his deed. But there was no intention to consolidate their several titles by the purchasers. They had purchased in unequal portions a large tract of land. It had been conveyed to them by several and distinct conveyances. They did not expect to make partition, and occupy the land immediately. Their object was to sell, and this object could be best attained, as they supposed, by acting together. They agreed, therefore, on common trustees to hold the legal estate, and on a committee, who should be the common agents, stewards, or attorneys of the parties. But in their deeds to the trustees they covenant severally, each one for himself, and expressly renounce all mutual responsibility. They agreed to appoint the same trustees, and the same agents, but there is nothing from which it can be in the slightest degree inferred, that they intended to take the risks of each other's titles. It was not necessary to say, whether the commissioners were well supported in the decision which they had made. No fraud or negligence is at any rate imputed to the defendants. They have used due diligence, and sought to increase the fund, by obtaining from the commissioners the stock which would have belonged to the original purchase of Wetmore, if his title had been deemed valid. In this they have failed without any fault of their own. The commissioners have decreed, that that portion of Wetmore's purchase which was conveyed to Williams, through whom the plaintiff derives her title, is not entitled to any indemnification. They proceed on the ground, that the original Georgia vendors had a lien for the purchase-money, and that they, if any body, the purchase-money not being paid, are entitled to the indemnity provided by the act of congress. That the vendor has in equity a lien for the purchase-money against the vendee, and all purchasers under him with notice, if it be a legal estate; and against all persons purchasing with or without notice, if it be an equitable estate; could not be denied as a general doctrine. The English cases, on this point, are all considered by Lord Eldon in Mackreth v. Symmons [supra]. There may be a relinquishment of this lien; and the evidence of such relinquishment may result from the nature of the transaction and the circumstances attending it. How far such evidence existed here, it was the duty of the commissioners to consider. If they have erred in judgment, the consequences of that error ought not to be thrown on the defendants. The stock, which the commissioners were to issue, may be considered as the proceeds or product of the estate vested in the trustees. The bill does not complain, that the defendants have injured the plaintiff by surrendering the estate to the United States. In this they are admitted to have done precisely what

they ought to have done. The complaint is, that a just distribution has not been made of the proceeds. But the plaintiff's estate has produced no proceeds. The commissioners were empowered by the act to judge between adverse claims. They have decided against the claim of the plaintiff; and it would be manifestly unjust and unreasonable, that, having a bad claim herself, she should partake with others in the benefit of their claims, which are good, unless she clearly proves an agreement to form this sort of partnership. And indeed if it were proved, that Wetmore and others agreed to form this partnership, each at the same time covenanting for the title of what he himself brought to the common stock, he could not claim in equity a proportionate share of the proceeds of the whole, having broken his own covenant, and the general proceeds being thereby diminished in an amount equal to what he undertook to convey to the trustees. If the plaintiff could recover in this case against the defendants, one of whom is the surviving trustee, that trustee must have his action against Wetmore on the covenants of his deed of trust. But such a proceeding would be novel. It is not the course in equity to treat covenants as distinct and independent, but to require of plaintiffs to allege and prove performance, or readiness to perform on their part. 2 Fonbl. Eq. 383. If the land, or its proceeds, have been taken from the trustee by some one, whose title has been adjudged better than that of the cestui que trust, is it possible, that the cestui que trust can have any claim on the trustee? The plaintiff relies on the articles of association, which say that the certificate shall be complete evidence of the title. So it may be; but it does not say what title the holder of the certificate shall be taken to have. The articles mean no more than that the certificate should be evidence of the transfer. Whatever the vendor could sell, he might assign by endorsing the certificate. But in this there is no agreement to assure the title. The certificate itself refers to the articles of association and the deeds of trust, to show the nature and condition of the property. These articles and deeds prove clearly, that the original purchasers stand on their several distinct purchases, and decline all mutual responsibility. She must therefore be taken to have known, what she purchased, as the reference in the certificate to the deeds and articles was sufficient to put her on inquiry. Where one has sufficient information to lead him to the knowledge of the fact, he shall be deemed conusant of it. Sugd. Vend. 498, and cases there cited. Even if her estate had been a legal and not an equitable interest, still this constructive notice would have prevented her from standing in any better condition, than those under whom she held. It may be added, that this whole subject was within the jurisdiction of the commissioners. They were not bound to award an aggregate sum to the de-

fendants, to be by them divided for the benefit of the associates. In point of fact they did award in some instances to individuals, who made application for themselves, not through the agency of the defendants. In regard to the sums, which the defendants have received, the commissioners have decreed, that the plaintiff is entitled to no portion. Whatever their original rights were, all parties have agreed to surrender them to the United States, and to receive indemnification to the amount and in the manner, provided by the act of congress. Under that act nothing has been allowed the plaintiff. The defendants, as her agents, have received nothing, and therefore can be chargeable with nothing.

Mr. Amory, for plaintiff.

The fee simple in the lands in question, which vested in Wetmore, was transferred to Hull and others, trustees, and ever after remained in them. Mrs. Gilman, the plaintiff, was not the assignee of Wetmore, and did not hold his title; she could not be an assignee without a privity, either in fact or in law, which did not exist in this case. The intention of the associates was, from the commencement, to avoid the difficulties of title, and to render the certificates of the trustees the only evidence thereof, for which purpose the legal title was placed in the trustees, and a new title, in all the property, was derived from them. The certificate possessed by Mrs. Gilman does not contain the name of Wetmore, nor was the certificate originally issued in his name; it could not have expressed a trust upon the portion, or title, acquired by him and conveyed to the trustees; but such a certificate must have expressed a general interest or title, pervading the whole land. Inasmuch as the trustees derived their title, not from Wetmore only, but from different sources, it must be presumed and intended, that their certificates were to operate generally on all the right and title, which they possessed, without reference to the mode of acquirement. If Mrs. Gilman, or any holder of certificates, was obliged to search into the title, this estate would be attended with all the consequences and incidents of other titles; but the difficulty was expressly intended to be avoided by the 12th act of association, which declares, that such certificate shall be complete evidence; thereby announcing to any purchaser, that the common rules of real property were dispensed with. Shall the trustees and associates now be permitted, contrary to their express stipulation, to depart from this rule of property, which they themselves created, and thus entrap a bona fide purchaser without notice? This association was not incorporated, but the parties intended, as far as they could by law, to give it those facilities, and, in some degree, to convert this real estate into personal estate. The title at law was to vest in the trustees, until bona fide sales of the land were actually made. It is the proceeds of such sales only, or money acquired therefrom, that is assured to the holders of the certificates. It is analogous to the original stockholders in a bank; if one stockholder had originally deposited counterfeit money for his share in the funds, and he had afterwards sold his certificates, and new ones were granted, the new stockholder would not be affected by the false consideration. The trustees and original purchasers undertook to examine each other's title, and precluded all further inquiries in relation to it. Wetmore gave a quit-claim deed only; the quality of his title the associates or trustees could judge of, of which they had as much knowledge as he had; and such deed of quit-claim, whether it conveyed a good or a bad title, constituted a good consideration for the compact with the associates and trustees. It might have been, that Mr. Wetmore's title would have been good, and the other titles bad, by the non-payment of the notes of the other parties, or other cause. This hazard the parties severally sustained, in regard to each other's rights, and made a common stock of all their titles. Was Mr. Wetmore's title, at any period, a good one? If so, what has made it bad? The idea of lien for the unpaid notes of the purchaser without mortgage, is unknown in Massachusetts; and any person learned in the law would have pronounced it to have been good before the decree of the commissioners. If the doctrine of lien for the purchase-money, without mortgage, obtains in Georgia, the contract being made in Massachusetts, where the intention of both parties must be considered as constituting the contract, the laws of Massachusetts ought to construe such contract in preference to those of Georgia. We contend, that this doctrine of lien is only a creature of equity, and refers only to such estates or rights of real property, as are especially recognised by that tribunal, and which do not derive their support from the ordinary rules of law. The title, in order to be what is commonly denominated equitable, must be such a one, as is not recognised by law; such as the assignment of a chose in action, which cannot be assigned by law; or the title must be equitable from the inefficient mode adopted for its transfer, such as the conveyance of real estate by an instrument without seal, or by an executory contract. The conveyance of land, in this case, did not pass an equitable title merely; but the case of Fletcher v. Peck [6 Cranch (10 U. S.) 87], and a subsequent case, in the same court, show, that notwithstanding the Indian title be not extinguished, the freehold and seisin may be transferred; and, in this case, the most solemn deeds and instruments, duly acknowledged, were adopted for the conveyance of the title; and it is sustained by every

legal form. Even in courts of equity, this lien is only raised by implication; and where other circumstances resist this implication, showing that the parties did not mean to rely on the estate sold, for security, such lien was waived. This transaction is filled with circumstances repugnant to such implication. The design of the parties to sell the land, instead of cultivating the same, whereby to pay the notes, expressly excludes the idea of such a lien; as no man would have purchased, who knew that such a note was given for the first purchase, without seeing that his money was appropriated to extinguish the notes; and the strongest circumstance, to repel such a lien for the consideration, consists in this, that the sum of five dollars only is expressed as the pecuniary consideration. Any purchaser, therefore, making inquiry concerning the purchase-money's being paid or not, is at once checked in the pursuit; and we call on the defendants to show any case of lien for the purchase-money, where the sum is not expressed in the deed of sale. Such nominal consideration and concealment of the true one, seems to be properly inserted in order to waive such lien. It is also a doctrine in equity, that the vendee has a lien on the land, in case the title be defective and proper conveyance not made to him, thus making the right reciprocal. But in this deed express provision is made, that the consideration-money shall not be refunded by the vendor for any cause whatsoever; thus essentially distinguishing the present case from those, in which such lien is maintained. It is said, that the commissioners, having a right to decide upon adverse titles, here conclusively decided on our claims; but this we deny, as the adverse titles or claims, on which they were to decide, were adverse claims to the stock from the treasury of the United States, and between such persons, as released their claims to the United States. Mrs. Gilman did not release any claim to the United States, nor demand any money from the treasury; of course her rights or claims could not be adjudged by the commissioners. Her claim is not on the government, but on her associates and trustees. The commissioners were bound to decide, to whom the money or stock from the treasury should be paid; not the use the receiver should afterwards make of that money, or the obligations he might be under in relation to it. Suppose Steward and Michael had never applied to the commissioners, or released their claims on the scrip, but had called on the directors as the plaintiff does, what opinion or decree of the commissioners would have been known on this subject? And shall such a casual circumstance affect her rights? Decrees of law affect only those who are parties to the suit, and an opinion incidentally given by the commissioners, ought not to control the plaintiff's rights.

This money, except a very small sum, was delivered to the directors as such, for the use of the members, as much as one year previous to the declaration of the sentiments of the commissioners on this subject. The rights of Mrs. Gilman, with respect to the money, vested in her, when it was first received by the directors, and a subsequent opinion of the directors, in relation to the claims of Michael and Steward, cannot alter her rights. The commissioners had power to judge, whether Michael and Steward should receive any money from the treasury of the United States; but they could not decide what rights they had on other persons. Suppose the company had been dissolved some years past, and by a vote of the company, the trustees were directed to convey to each associate his portion of the land; could they, in such case, have conveyed to Mrs. Gilman a portion of Mr. Wetmore's interest in said land, or a portion of their own? And if of their own, which must have been the case, the same would have embraced their title, acquired from other persons; and if, on receiving such release from the trustees, or even from Mr. Wetmore, Mrs. Gilman, under this act of congress, had released to the United States, and the commissioners had not allowed her an indemnity, the legal title would now have vested in her; as the act provides, that the releases shall not operate, until an indemnity is granted; whereas she has now lost her right, by consenting, that the trustees and directors should release her title. This consent was given in contemplation, and on assurance of receiving her rateable part of the funds received by the directors. They, however, hold the funds, and do not reinstate her in her former title. In short, every consideration, both in law and equity, demonstrates her right to a portion of this stock.

STORY, Circuit Justice. The material questions in this case are: 1st. What is the nature and validity of the plaintiff's title to the shares, which she claims in the lands of the New England Mississippi Land Company? 2dly. Supposing it to be originally valid, is it extinguished? Or is the plaintiff estopped from asserting it, by the award of the commissioners? 3dly. If not, is she in equity entitled to claim her proportion of the certificates of the public stock, which have been received by the company under the award of the commissioners? The estate acquired by the first grantees, Messrs. Jarvis, Newman, and Wetmore, under the conveyance to them by the Georgia Mississippi Company, was beyond all question a legal, and not merely an equitable estate in fee simple. By the subsequent conveyances, first to the respective purchasers, and next by them to the trustees, Messrs. Jarvis, Newman, and Hull, a legal estate in fee was also conveyed; so that the latter became seised of the whole

tract of land in fee, subject to the terms, conditions, and trusts, stated in the trust-deed and the articles of association of the New England Mississippi Land Company. The titles of all the original purchasers were acquired at the same time, under the same contract; and, at the instant they were complete, were conveyed to the trustees in the same state, that they were acquired, uno flatu. There is no pretence of any intermediate incumbrance, unless there was a lien for the purchase-money; a point, which will hereafter be considered; and to the extent of that lien, if any, it must be admitted, that the holders of the scrip or shares under the articles of association cannot place themselves in a better situation, than the trustees, who must be taken to be conusant of the facts of the original purchase. For, whether the scrip or shares are to be deemed a shifting use or trust, or personal property, notice to the trustees, who hold the legal estate, affects and binds all, for whom they originally held, or have, upon the transfer of the shares, continued to hold.

But the material consideration is, whether, in virtue of the articles of association, and the conveyances made in pursuance thereof, the original purchasers, and those claiming by assignments under them, are to be considered as holding strictly and exclusively under the original titles of the original purchasers; or whether the whole lands are to be considered as thrown into a common stock, and the scrip-holders are entitled to an undivided portion of the whole stock under the company itself. And, upon the best consideration, which I can give the subject, it does seem to me, that the latter is the true interpretation of the acts of association. The original purchasers were conusant of each other's titles; and mutually agreed to the articles of association, and to the manner, in which the conveyances should be made, before their titles were complete. They agreed to release to the trustees their respective rights and titles in the whole lands included in the purchase; and that the trustees should hold the aggregate amount, to be disposed of, not as a several trust of the respective purchasers, but as the joint stock of the company itself. To be sure, the purchasers were to take certificates of shares according to their original proportions in the purchase; but, in this respect, the case is not distinguishable from that of subscribers to a bank, or insurance company, who contribute a certain amount of the capital stock, and become entitled to a similar amount of shares. Yet no person ever imagined, that they were holders of the specific money paid in; and, if their title to that money should be impugned, that the holder under them lost his right to the shares transferred to him. The only remedy, that would remain, would be personal against the original subscribers for a failure of their titles. In the present case,

upon the conveyance to the trustees, each purchaser (excepting Messrs. Wetmore, Jarvis, and Newman) covenanted personally with the trustees, for his own share of the land, against incumbrances. And in case of such incumbrance, (which, except from an implied lien for the purchase-money, could scarcely, from the circumstances of the case, by possibility arise), a personal remedy was provided under the covenant. After a very careful examination, I am unable to perceive throughout the whole articles the slightest allusion to any stipulation, by which the proprietors of scrip or shares were to hold, not under the company, but under the original purchasers; and were to be affected by all the circumstances, that might affect the original grant of the land to them. On the contrary, the very certificates of shares, which on their face carry an assignable quality, and the provision, "that they shall be complete evidence to the legal holder of his right in the purchase," or stock, as well as the manifest objects of the association, in my judgment require, that the whole stock should be deemed to belong to the company in its aggregate capacity; and that every scrip-holder should be held to take a specific proportion, not of the specific stock of an original purchaser, but of the common stock of the company itself. And if the association had been incorporated, instead of being voluntary, under similar articles and conveyances, I am at a loss to conceive, how it would be possible to sustain a different proposition. The fact of the association being voluntary, and not incorporated, cannot in a legal view change the construction, which the articles would otherwise require. On examining the articles, it will at once be seen, that the principal objects of the association were, to unite the several distinct interests of the purchasers into one common interest; to produce uniform and simultaneous efforts to enhance the value of the property; to prevent the injurious competitions and collisions arising from individual and separate negotiations; to provide a common fund for all expenses, and a uniform mode of selling the property for the general and common benefit of all the proprietors; and to give a negotiable quality to the stock or property, which, without impairing the great objects of the association, might facilitate the transfer of shares in the property, and give it a marketable value. For these purposes, the entire management and control of the whole funds or property were given to a board of directors, with full authority to dispose of the same at their sole pleasure and discretion. Taxes were to be levied pro rata on all the proprietors; and their shares in the stock were held responsible for the payment. The moneys received upon every sale of any portion of the property were to be distributed among all the proprietors according to their shares; and the evidence of their title to any shares was to

be vouched, and solely vouched by certificates, to be issued from time to time by the trustees, in a form prescribed in the articles. The negotiability of the stock itself would have been materially impaired by the supposition, that each successive holder was bound to trace up his title, through his own vendor, to the first and original purchaser; and to ascertain, what were the rights and liabilities of such purchaser, and of all the intermediate holders from the origin of the title. Such an inquiry would at all times have been difficult; and, from its involving matters en pais, must have been in most cases very unsatisfactory in its result. If with these considerations we combine the form of the certificate itself which states the shares of the proprietor, and the manner in which he is to hold them, without any notice of, or reference to, the title of any original purchaser from whom they are derived; and the declaration of the articles, that it is to be complete evidence of title; it is difficult to resist the impression, that the company must have meant, that the certificate should be conclusive evidence of title in the holder of his shares, not in the stock of any individual original purchaser, but in the common stock of the company itself. In short, that the whole property was an aggregate fund belonging to the company in its collective capacity, and that each proprietor held his shares under the company's grant, and in no other manner. My judgment accordingly on this point is, (though with the greatest deference for a different judgment pronounced by another tribunal) that the plaintiff held 60,000 acres of the common capital stock of the company, and not of the specific acres originally purchased by Mr. Wetmore. The title to the whole tract of land belonging to the company has, under the act of congress, been lawfully released by the company or its agents to the United States, and the plaintiff's portion included in that release. Of that act she does not, and, indeed, has no right to complain, because it is in strict conformity with the articles of association. What she claims is, to receive her proportion, according to her interest, of the certificates of public stock received by the company under the award of the commissioners, as an indemnification for that release.

The objections urged by the defendants against this claim are: 1st. That the award of the commissioners is conclusive upon the subject matter of the claim, and that the plaintiff is thereby estopped to assert it. 2dly. Supposing the award of the commissioners is no estoppel; still it is right upon principles of equity, and that therefore, under all the circumstances of the case, the plaintiff has no right to sustain the present suit. In respect to the accuracy of the grounds, upon which the commissioners have made their award, it certainly behoves this court to speak with the utmost diffidence. Although the written opinion, containing those grounds, is before this court; yet some facts are stated, which have no existence in this cause, and references are made to others in so indistinct and general a manner, that it is not easy to ascertain the precise nature or bearing of them. What I shall therefore say in respect to that award will refer rather to principles of law, than conclusions of fact, and always with this reserve, that I shall only discuss these principles with reference to the facts of this cause, and upon the supposition, that they are not inconsistent with what appeared before the commissioners. I own, that there are some things in the written opinion of the commissioners, which I do not perfectly comprehend. When it is stated, that "the board has expressed an opinion, that the vendors in this case conveyed only an equitable title," (and by the vendors I understand them to mean the Georgia Mississippi Company) I am somewhat at a loss to know, what meaning is to be attached to the language. If there is any point in the case, which is free of doubt, this seems to be that point. That the state of Georgia was seised in fee simple, and had a capacity to convey, notwithstanding the non-extinguishment of the Indian title, is completely established by the case of Fletcher v. Peck, 6 Cranch [10 U. S.] 87. And that a grant by a state of its own lands conveys a seisin to the grantees without further act or ceremony, is as distinctly established by the case of Green v. Liter, 8 Cranch [12 U. S.] 229. By the grant, therefore, from the state of Georgia, the Georgia Mississippi Company became seised in fee simple of the whole tract of land; and that company legally conveyed that fee simple to Messrs. Jarvis, Newman, and Wetmore, and they again conveyed the same to the trustees. It seems to me, therefore, extremely difficult to sustain this opinion of the commissioners upon any principles of law, which have occurred to me in the course of this investigation.

The doctrine, that a lien exists on the land for the purchase-money, which lies at the foundation of the decision of the commissioners, as well as of the present defence, deserves a very deliberate consideration. It can hardly be doubted, that this doctrine was borrowed from the text of the civil law; [4] and though it may now be considered as settled, as between the vendor and the vendee, and all claiming under the latter with notice of the non-payment of the purchase-money; yet its complete establishment may be referred to a comparatively recent period. Lord Eldon has given us an historical review of all the cases (Mackreth v. Symmons, 15 Ves. 329), from which he deduces the following inferences: First, that, generally speaking, there is such a lien. Secondly,

---

[4] "Quod vendidi, non aliter accipientis, quam si aut pretium nobis solutum sit, aut satis eo nomine factum, vel etiam fidem habuerimus emptori sine ulla satisfactione." Dig. lib. 18, tit. 1, l. 19; Domat, lib. 1, tit. 2, § 3, l. 1.

that in those general cases, in which there would be a lien, as between vendor and vendee, the vendor will have the lien against a third person, who had notice, that the money was not paid. These two points, he adds, seem to be clearly settled; and the same conclusion has been adopted by a very learned chancellor of our own country. Garson v. Green, 1 Johns. Ch. 308. The rule, however, is manifestly founded on a supposed conformity with the intentions of the parties, upon which the law raises an implied contract; and therefore, it is not inflexible, but ceases to act, where the circumstances of the case do not justify such a conclusion. What circumstances shall have such an effect, seems indeed to be a matter of a good deal of delicacy and difficulty; and the difficulty is by no means lessened by the subtle doubts and distinctions of recent authorities. It seems, indeed, to be established, that prima facie the purchase-money is a lien on the land; and it lies on the purchaser to show, that the vendor agreed to waive it (Hughes v. Kearney, 1 Schoales & L. 132; Mackreth v. Symmons, 15 Ves. 329; Garson v. Green, 1 Johns. Ch. 308); and a receipt for the purchase-money, endorsed upon the conveyance, is not sufficient to repel this presumption of law. But how far the taking a distinct security for the purchase-money shall be held to be a waiver of the implied lien, has been a vexed question.

There is a pretty strong, if not decisive, current of authority, to lead us to the conclusion, that merely taking the bond, note, or covenant of the vendee himself for the purchase-money, will not repel the lien; for it may be taken to countervail the receipt of the payment usually endorsed on the conveyance. Hughes v. Kearney, 1 Schoales & L. 132; Nairn v. Prowse, 6 Ves. 752; Mackreth v. Symmons, 15 Ves. 329; Blackburn v. Gregson, 1 Brown, Ch. 420; Garson v. Green, 1 Johns. Ch. 308; Gibbons v. Baddall, 2 Eq. Cas. Abr. 682; Coppin v. Coppin, 2 P. Wms. 291; cases cited in Sugd. Vend. c. 12, p. 352, etc. But where a distinct and independent security is taken, either of property or of the responsibility of third persons, it certainly admits of a very different consideration. There, the rule may properly apply, that "expressum facit cessare tacitum"; and where the party has carved out his own security, the law will not create another in aid. This was manifestly the opinion of Sir William Grant in a recent case; where he asks, "If the security be totally distinct and independent, will it not then become a case of substitution for the lien, instead of a credit given because of the lien?" And he then puts the case of a mortgage on another estate for the purchase-money, which he holds a discharge of the lien, and asserts, that the same rule must hold with regard to any other pledge for the purchase-money. Nairn v. Prowse, 6 Ves. 752. And the same doctrine was asserted in a very early case, where a

mortgage was taken for a part only of the purchase-money, and a note for the residue. Bond v. Kent, 2 Vern. 281. Lord Eldon, with his characteristic inclination to doubt, has hesitated upon the extent of this doctrine. He seems to consider, that whether the taking of a distinct security will have the effect of waiving the implied lien, depends altogether upon the circumstances of each case, and that no rule can be laid down universally; and that, therefore, it is impossible for any purchaser to know, without the judgment of a court, in what cases a lien would, and in what cases it would not, exist. His language is, "If, on the other hand, a rule has prevailed (as it seems to me), that it is to depend, not upon the circumstance of taking a security, but upon the nature of the security, as amounting to evidence (as it is sometimes called), or to declaration plain, or manifest intention (the expression used on other occasions), of a purpose to rely not any longer upon the estate, but upon the personal credit of the individual; it is obvious, that a purchaser taking a security, unless by evidence, manifest intention, or declaration plain, he shows his purpose, cannot know the situation, in which he stands, without the judgment of a court, how far that security does contain the evidence, manifest intention, or declaration plain upon that point." Mackreth v. Symmons, 15 Ves. 329, 342; Austen v. Halsey, 6 Ves. 475. If, indeed, this be the state of the law upon this subject, it is reduced to a most distressing uncertainty. But, on a careful examination of all the authorities, I do not find a single case, in which it has been held, if the vendor takes a personal collateral security, binding others as well as the vendee, as, for instance, a bond or note with a surety or an indorser, or a collateral security by way of pledge or mortgage, that under such circumstances a lien exists on the land itself. The only case, that looks that way, is Elliot v. Edwards, 3 Bos. & P. 181, where, as Lord Eldon says, the point was not decided; and it was certainly a case depending upon its own peculiar circumstances, where the surety himself might seem to have stipulated for the lien, by requiring a covenant against an assignment of the premises, without the joint consent of himself and the vendor. Lord Redesdale, too, has thrown out an intimation (Hughes v. Kearney, 1 Schoales & L. 132) that it must appear, that the vendor relied on it as security; and he puts the case, "Suppose bills, given as part of the purchase-money, and suppose them drawn on an insolvent house, shall the acceptance of such bills discharge the vendor's lien? They are taken not as a security, but as a mode of payment." In my humble judgment, this is begging the whole question. If, upon the contract of purchase, the money is to be paid in cash, and bills of exchange are afterwards taken in payment, which turn out unproductive, there the receipt of the bills may be considered as a

mere mode of payment. But if the original contract is, that the purchase-money shall be paid at a future day, and acceptances of third persons are to be taken for it, payable at such future day, or a bond with surety payable at such future day, I do not perceive, how it is possible to assert, that the acceptances or bond are not relied on as security. It is sufficient, however, that the case was not then before his lordship; and that he admits, that taking a distinct security would be a waiver of the lien. On the other hand, there are several cases, in which it is laid down, that if other security be taken, the implied lien on the land is gone. To this effect certainly the case of Fawell v. Heelis, 2 Amb. 724, 2 Dick. 485, is an authority, however it may, on its own circumstances, have been shaken. And the doctrine was explicitly asserted and acted upon in Nairn v. Prowse, 6 Ves. 752. See, also, Bond v. Kent, 2 Vern. 281. In our own country, a very venerable judge of equity has recognised the same doctrine. He says, "The doctrine that the vendor of land, not taking a security nor making a conveyance, retains a lien upon the property, is so well settled as to be received as a maxim. Even if he hath made a conveyance, yet he may pursue the land in the possession of the vendee, or of a purchaser with notice. But if he hath taken a security, or the vendee hath sold to a third person without notice, the lien is lost." Cole v. Scot, 2 Wash. [Va.] 141. Looking to the principle, upon which the original doctrine of lien is established, I have no hesitation to declare, that taking the security of a third person for the purchase-money ought to be held a complete waiver of any lien upon the land; and that in a case standing upon such a fact, it would be very difficult to bring my mind to a different conclusion. At all events, it is prima facie evidence of a waiver; and the onus is on the vendor to prove, by the most cogent and irresistible circumstances, that it ought not have that effect.

Such was the result of my judgment upon an examination of the authorities, when a very recent case before the master of the rolls first came to my knowledge. I have perused it with great attention, and it has not, in any degree, shaken my opinion. The case there was of acceptances of the vendee and of his partner in trade, taken for the payment of the purchase-money. It was admitted, that there was no case of a security given by a third person, in which the lien had been held to exist. But the master of the rolls, without deciding what would be the effect of a security, properly so denominated, of a third person, held, in conformity to the opinion of Lord Redesdale, that bills of exchange were merely a mode of payment, and not a security. This conclusion he drew from the nature of such bills, considering them as mere orders on the acceptor to pay the money of the drawer to the payee; and that the acceptor was to be con-

sidered, not as a surety for the debt of another, but as paying the debt out of the debtor's funds in his hands. Grant v. Mills, 2 Ves. & B. 306. With this conclusion of the master of the rolls, I confess myself not satisfied, and desire to reserve myself for the case, when it shall arise in judgment. It is founded on very artificial reasoning, and not always supported in point of fact by the practice of the commercial world. The distinction, however, on which it proceeds, admits, by a very strong implication, that the security of a third person would repel the lien. If indeed the point were new, there would be much reason to contend, that a distinct security of the party himself would extinguish the lien on the land, as it certainly does the lien upon personal chattels. Cowell v. Simpson, 16 Ves. 275. In applying the doctrine to the facts of the present case, I confess, that I have no difficulty in pronouncing against the existence of a lien for the unpaid part of the purchase-money. The property was a large mass of unsettled and uncultivated lands, to which the Indian title was not as yet extinguished. It was, in the necessary contemplation of all parties, bought on speculation, to be sold out to sub-purchasers, and ultimately to settlers. The great objects of the speculation would be materially impaired and embarrassed by any latent incumbrance, the nature and extent of which it might not always be easy to ascertain, and which might, by a subdivision of the property, be apportioned upon an almost infinite number of purchasers. It is not supposable, that so obvious a consideration should not have been within the view of the parties; and viewing it, it is very difficult to suppose they could mean to create such an incumbrance. A distinct and independent security was taken by negotiable notes, payable at a future day. There is no pretence, that the notes were a mere mode of payment, for the endorsers were, by the theory of the law, and in fact, conditional sureties for the payment; and in this respect the case is distinguishable from that of receiving bills of exchange, where, by the theory of the law, the acceptor is not a surety, but merely pays the money of the drawer in pursuance of his order. Hughes v. Kearney, 1 Schoales & L. 132; Grant v. Mills, 2 Ves. & B. 306. The securities themselves were, from their negotiable nature, capable of being turned immediately into cash; and in their transfer from hand to hand, they could never have been supposed to draw after them, in favor of the holder, a lien on the land for their payment. But I pass over these and some other peculiar circumstances of this case, and put it upon the broad and general doctrine, that here was the security of a third person, taken as such, and that extinguished any implied lien for the purchase-money.

There is another view of this case, which enforces the opinion, which has been already

expressed. The contract for the purchase was originally made and executed in Massachusetts with citizens of that state, and having no tacit reference to the laws of any other state, further than that the title to the land should be conveyed, so as to be binding by the laws of that state. The first deed of the land was, in fact, executed by the vendors in Massachusetts, and the deed of confirmation in Georgia. Nothing can be clearer, than that, by the law of Massachusetts, no lien in any case whatsoever exists upon land for the purchase-money. We have no court of chancery to recognise and enforce such a lien; and the peculiar principles and doctrines of courts of equity have never been adopted into our jurisprudence. The general rule of law certainly is, that contracts are to be construed according to the law of the place, where they are made and to be executed. Even contracts respecting lands, lying in another state, form no necessary exception to the rule; for these, in many instances, both as to rights and remedies, are governed by the lex loci contractus. Stapleton v. Conway, 1 Ves. Sr. 428, 3 Atk. 727; Van Schaick v. Edwards, 2 Johns. Cas. 355. What is the law of Georgia on this subject, I have no present means of knowing. But it does seem to me, that it will be very difficult to maintain the proposition, that a lien is to be implied upon a contract made and executed in Massachusetts, when the laws of that state repel any such right. I do not know, that it has ever been established, that a party, executing in one state a contract and conveyance of land lying in another, is to be held to reserve all the rights and remedies, which the law of the state, where the land lies, might give, and the law of the place of the contract would deny. It seems more reasonable, that the general rule of law should in such case prevail, that the contract should be construed according to the law of the place, where it is executed. But certainly when a lien is to be created upon a supposed intention of the parties, there ought to be, in such a case, the clearest evidence of such intention. It is not sufficient, that the vendor supposed, that he was contracting according to the law of one state, and so had a lien, if the vendee supposed the reverse, and never dreamed of a lien. Now, there is not the slightest reason to imagine, that the vendees ever contemplated a lien in the present case. The very objects of their association in the purchase would have been defeated, or embarrassed by it. No notice is pretended to have been given of such a claim by the vendors; but a distinct and independent security was taken. Under such circumstances, it seems to me irreconcilable with sound principles and justice, to establish a latent lien, which must so materially impair the rights of innocent and ignorant parties. For it is to be considered, that until the decision of the commissioners, no such lien was ever contemplated by the scrip-holders in Massachusetts.

Another subject necessarily connected with this cause, and of a good deal of delicacy, remains to be considered; and that is, whether the commissioners had authority to entertain any question in respect to a lien for the purchase-money; or, in other words, whether they had jurisdiction to make any award respecting the supposed equitable right of lien of the vendors of the land. The act of congress—Act March 31, 1814, c. 98, § 2 [3 Stat. 116, c. 39]—authorizes the commissioners "to adjudge and finally determine upon all controversies, arising from such claims so released as aforesaid"; that is, from all claims released under the first section of the act, or of the acts supplementary thereto. Act January 23, 1815, c. 706 [3 Stat. 192, c. 24], and Act March 3, 1815, c. 778 [3 Stat. 235, c. 97]. The word "claim" is certainly of very large signification in the law, and it undoubtedly extends to all equitable, as well as legal estates in the land released. But a person, having a lien on land, has not any estate in, or right to the land; and it has been very correctly observed of the lien of a judgment creditor, that "he has neither a jus in re, nor a jus ad rem, and therefore though he releases all his right to the land, he may extend it afterwards." Brace v. Duchess of Marlborough, 2 P. Wms. 491. The lien of a vendor for the purchase-money is not of so high and stringent a nature, as that of a judgment creditor, for the latter binds the land according to the course of the common law, whereas the former is the mere creature of a court of equity, which it moulds and fashions according to its own purposes. It is, in short, a right, which has no existence, until it is established by the decree of a court in the particular case; and is then made subservient to all the other equities between the parties, and enforced in its own peculiar manner, and upon its own peculiar principles. It is not, therefore, an equitable estate in the land itself, although sometimes that appellation is loosely applied to it; and it is never enforced against a subsequent bona fide purchaser of the legal estate without notice. It is to me, in this view, a matter of extreme doubt, whether it was within the jurisdiction of the commissioners; it not being technically a claim in the land, nor, of course, the proper subject of release within the act of congress. It is, too, so peculiarly and exclusively the creature of a court of equity, that its existence cannot be safely averred independent of the decree of such a court. And to suffer the commissioners (who are, in no correct sense, a court of equity) to award respecting such a lien, without the means or authority to settle all other equities between the parties, or enforce an equitable decree, could scarcely have been within the reasonable contemplation of congress. If such a lien were asserted, it was proper matter for a suit in equity, after the rights of the parties to the land itself had been ad-

justed under the commission. Thus much it has become my duty to state, in respect to the merits of the proceedings before the commissioners, so far as they involve important principles of law, applicable to the present suit. If these proceedings were conclusive upon the plaintiff, I might have been spared this discussion. But I am distinctly of opinion, that they are not so conclusive. The commissioners had no right or authority to adjust or settle any claims of the plaintiff, relative to the New England Mississippi Land Company. They had a right to examine into the title of the company to the land claimed by them, and to decide upon the sufficiency of that title. But as to the shares held under the company by the plaintiff, or the rights appertaining thereto, as against the company itself, the plaintiff never submitted her claims to them; and their award would be res inter alios acta. The commissioners were not justified in severing the plaintiff's interest from that of the company. The trustees held the legal estate, and the directors had the sole right to dispose of it. It was the property of the company in its collective capacity, liable to its debts, and to be accounted for and settled according to the articles of association; and the individual share-holders, as such, had no authority to act in relation to it.

Upon the whole my judgment is, that the plaintiff as a holder of certain shares of the common stock of the company, and not of Mr. Wetmore, is entitled to the relief, which she claims. Whatever has been lost by the company is a general loss, occasioned, not by her default, but, as I think, by the mistake of the commissioners; and is to be borne by the whole company in proportion to their interest. She has, by the general release of the company, lost all title to the land; and is equitably and legally entitled to her share of all the stock received as an indemnification for release. Decree accordingly.

[NOTE. The respondents appealed the case to the supreme court, and the decree of the circuit court was affirmed in an opinion by Chief Justice Marshall. 4 Wheat. (17 U. S.) 255. In examining the case, the nature of the contract of sale of the land, the motives of the New England Mississippi Company, and their acts were all exhaustively considered. The holder of every certificate was not bound to trace his title through the particular original purchaser under whom he claimed, and in whose place he stood. It is not more apparent that the general object of the association was to promote the sale of their lands than it is that the particular object of this certificate and of the articles which relate to it was to enable every proprietor to avail himself of his individual interest and to bring it into circulation. On no other principle can we account for subdividing the stock of the company into such small shares; for issuing the certificate itself; for making it assignable. If any latent defect existed in the title of one of the original purchasers, such defect could not have been set up against an assignee. "We think," remarked the learned justice, "this. on principles of English law, a clear case of exemption from lien." Nor would it alter the lia-

bility of the New England Company to the complainant whether they were purchasers with or without notice.]