Decided June 15, 1896.

FRAME *v.* SLITER.

[45 Pac. 290.]

VENDOR'S LIEN.—A grantor of real estate by absolute deed, followed by delivery of possession to the grantee, has no implied equitable lien for the unpaid purchase money: *Pease* v. *Kelly*, 3 Or. 417; *Kelly* v. *Ruble*, 11 Or. 75, distinguished; *Gee* v. *McMillan*, 14 Or. 268, overruled.

APPEAL from Clatsop: THOS. A. McBRIDE, Judge.

Suit by R. A. Frame and A. W. Stowell, copartners as Frame and Stowell, against Charles F. Sliter

and others, to foreclose a vendor's lien. Judgment for defendants, and plaintiffs appeal. AFFIRMED.

For appellants there was a brief and an oral argument by *Mr. Joseph B. Thompson.*

No appearance for respondents, but by permission *Messrs. N. W. Barrett* and *Loring K. Adams* filed a brief as *amici curiæ* in response to Mr. Thompson's brief.

Opinion by MR. CHIEF JUSTICE BEAN.

The single question in this case is whether a grantor of real estate by absolute deed, followed by delivery of possession to his grantee, has an implied equitable lien thereon for the unpaid purchase money. It has been several times mooted in this court, but the doctrine of the English court of chancery, which recognizes and upholds such lien, has never been recognized or established here, although the state is classed by many textwriters among those in which the lien prevails. The earliest case in which reference is made to the question, and the one most strongly relied upon to sustain the doctrine, is *Pease* v. *Kelly*, 3 Or. 417, but the court in that case only decided that by taking a mortgage to secure the payment of purchase money the vendor waived the equitable lien, and therefore, could not maintain the suit. Nothing more was in fact decided in that case, although it is stated in the opinion that "the lien exists if there is no higher security." It is next referred to in *Kelly* v. *Ruble*, 11 Or. 75, (4 Pac.

593,) where the court, after disposing of the case on other grounds, say: "We have thus far impliedly admitted the existence of the equitable lien of a vendor of real estate for the unpaid purchase price. But we doubt the actual existence of the lien in this state: *Ahrend* v. *Odiorne*, 118 Mass. 261; *Kauffelt* v. *Bower*, 7 Serg. and R. 64. It is not believed the existence of such a lien was decided in *Pease* v. *Kelly*, 3 Or. 417." The question again arose in *Gee* v. *McMillan*, 14 Or. 268, (12 Pac. 417,) and Mr. Justice STRAHAN puts his decision in that case squarely on the doctrine of the existence of a grantor's lien, but Chief Justice LORD dissents *in toto*, and Mr. Justice THAYER, while concurring in the result upon other grounds, expressly disclaimed any intention to decide whether the principles upon which the doctrine is supposed to be founded are broad enough "to uphold a vendor's lien to the extent of raising a trust in favor of a grantor, who has conveyed by deed of absolute conveyance, so as to admit of the purchase price being made a charge upon the property conveyed, in an ordinary case of sale of real estate." In *Lewis* v. *Henderson*, 22 Or. 548, (30 Pac. 324,) *Thomas* v. *Thomas*, 24 Or. 254, (33 Pac. 565,) and *Jones* v. *Gates*, 24 Or. 415, (33 Pac. 989,) where the doctrine is again referred to, the court carefully avoided approving it even by inference. From these decisions it is apparent that it has never received judicial sanction, or become a law of real property in this state, and its decision is now made necessary for the first time. We therefore feel at liberty to determine the question as one of first impression,

and, after having given it the careful and deliberate consideration which its importance demands, we are clearly of the opinion that the doctrine of a grantor's lien is so opposed to the general policy and course of legislation in this state that it ought not to prevail here. The whole tenor of our legislation is to make the title to real estate as simple and easily understood as possible, and to facilitate its transfer by discouraging all secret or latent equities, and requiring all conveyances thereof. and incumbrances thereon to be made a matter of public record.

The doctrine seems to have been borrowed by the English courts of chancery from the civil law, as a means of evading the rule of the common law under which land was not liable, both during and after the life of the debtor, for simple contract debts, and, after the reason for its original adoption had ceased to exist, was enforced upon the ground that the previous decisions had "the effect of contract, though no actual contract had taken place": *Mackreth* v. *Symmons*, 15 Ves. Jr. 329. Many of the courts of this country, following the English cases, have adopted the rule; but they have never been able, in our opinion, to place the doctrine upon any satisfactory principle applicable to the condition of affairs in a country where real estate is one of the principal articles of commerce, and liable for the debts of the owner, and in which a system of registration prevails. The doctrine has been variously stated to rest upon natural equity, a supposed intention of the parties, a trust arising out of the ven-

dee's holding the land without paying the price, the implied agreement of the parties, and an equitable mortgage, because there is no pretense in such cases that there was any agreement for security on the land, which is essential to an equitable mortgage; nor can it be supported as a trust, for a constructive trust cannot arise from the mere breach of a contract to pay money in the absence of fraud; nor on the ground of an implied agreement, because, as said by Mr. Justice GIBSON in 7 Serg. and R. 76: "The implication that there is an intention to reserve a lien for the purchase money in all cases where the parties do not, by express acts, evince a contrary intention, is, in almost every case, inconsistent with the truth of the fact, and in all instances, without exception, in contradiction of the express terms of the contract, which purports to be a conveyance of everything that can pass." Nor do we think it can now be put upon the natural equity "that a person having got the estate of another shall not, as between them, keep it and not pay the consideration," because there is no reason for a resort to equity in this country, where real estate is liable to seizure upon attachment and execution, and the courts of law afford a creditor a speedy remedy for the enforcement of his claim. And, besides, "It is inconsistent with natural justice," quoting again from Mr. Justice GIBSON in the case referred to, "that a vendor, who publishes to the world by the terms of his deed that he has parted with his whole interest, and has trusted to the personal security of the vendee, should become the ob-

ject of special protection against the consequences
of his own negligence, and that, too, at the expense
of a third person, who, in purchasing from the ven-
dee, even with notice that the purchase money was
unpaid, has been guilty of nothing positively im-
moral or even unconscionable." If a vendor sells
and conveys real estate, and, either through negli-
gence or even confidence, chooses to rely upon the
personal security of his vendee for the purchase
money," he has no special claim to the aid of a
court of equity to protect him from the conse-
quences of his own act, by enforcing some secret
lien which, in the nature of things, could be known
only to himself and his vendee and such persons
as they might take into their confidence, a practice
which if tolerated would have a tendency to open
wide the door to fraud and perjury.

The earliest English case which contains a full
discussion of the doctrine and the reason and au-
thorities by which it is supported is *Mackreth* v.
*Symmons*, 15 Ves. Jr. 329. In that case Lord Eldon
was only able to determine that two points were
clearly settled: *First*, that, generally speaking, there is
such a lien; and, *second*, that in those general cases
in which there would be a lien as between vendor
and vendee the vendor will have a lien against a
third person with notice that the money was not
paid. But as to what would be sufficient to make
a case in which the lien would not exist he felt
obliged to declare from the authorities that it was
"obvious that the vendor, taking a security, unless by
evidence, manifest intention, or declaration plain, he

shows his purpose, cannot know the situation in'
which he stands without the judgment of a court
how far that security does contain the evidence,
manifest intention, or declaration plain upon that
point," and that "it has always struck me, consider-
ing this subject, that it would have been better at
once to have held that the lien should exist in no
case, and the vendor should suffer the consequences
of his want of caution; or to have laid down the
rule the other way so distinctly that the purchaser
might be able to know, without the judgment of a
court, in what cases it would, and in what cases it
would not, exist." And, although the doctrine of
the English court of chancery has been the subject
of much learned discussion in this country, it is no
more satisfactory now than in Lord ELDON's time.
Indeed, it is much less so. From the very nature
of the lien itself there can be no fixed rules con-
cerning it. It is "a mere creature of a court of
equity, which it molds and fashions according to
its own purposes," and "has no existence until
it is established by the decree of a court in the
particular case; and is then made subservient to all
other equities between the parties": STORY, J., in
*Gilman* v. *Brown*, 1 Mason, 191 (Fed. Cas. No.
5441). And Mr. Justice POTTER says "its existence
depends upon and is controlled by no stated rules,
but, on the contrary, the existence of the lien is
generally made to depend upon the peculiar state of
facts and circumstances surrounding the peculiar
case, that is whether or not a case of natural equity
is established; and, if so, whether it is not made to

yield to higher or superior equities in some other person — whether the party is not to be regarded as having waived it, or as having intended to waive or postpone it to another equity, or whether, by the acts or omissions to act, or by the neglect of the party claiming such lien to enforce it within a rea- sonable time, the right is not lost as being the su- perior claim. These considerations control and vary the result as equity demands: *Fisk* v. *Potter*, *41 N. Y. 64.

Under the authorities, it would seem that where the doctrine prevails each case must be determined upon its own peculiar circumstances, according to the views of the chancellor and the weight of argu- ment at the bar; so that it is impossible to tell, without the judgment of a court, whether the lien does or does not exist. It may be well doubted whether any subject connected with the American law of real property has provoked more judicial dis- cussion and controversy, and is now in a more chaotic state, than the doctrine of a grantor's lien, where such lien is held to exist. There is hardly a rule upon the subject which has not been somewhere denied, and hardly any two states agree upon the essential points of the doctrine. "No other single topic belonging to the equity jurisprudence," says Mr. Pomeroy, "has occasioned such a diversity and even discord of opinion among the American courts as this of the grantor's lien. Upon nearly every question that has arisen as to its operation, its waiver, or discharge, the parties against whom it avails, and the parties in whose favor it exists, the

decisions in different states, and sometimes even in the same state, are directly conflicting. It is practically impossible to formulate any rules representing the doctrine as established throughout the whole country": 3 Pomeroy on Equity Jurisprudence, § 1251. Indeed, the remark attributed to Lord MANSFIELD that "the more we read the more we shall be confounded," is peculiarly applicable to the condition of the law upon this question. It has been adjudged that the lien does not exist under any circumstances after an absolute conveyance, by such able jurists as Mr. Justice Gray of Massachusetts, now of the supreme court of the United States, Gibson of Pennsylvania, Nash and Ruffin of North Carolina, Crozier of Kansas, Shipley of Maine, and Maxwell of Nebraska, to whose opinions in *Kauffelt* v. *Bower*, 7 Serg. and R. 64 (10 Am. Dec. 428); *Ahrend* v. *Odiorne*, 118 Mass. 261 (19 Am. Rep. 449); *Womble* v. *Battle*, 3 Iredell's Eq. (N. C.), 183; *Simpson* v. *Mundee*, 3 Kan. 172; *Philbrook* v. *Delano*, 29 Me. 410; *Edminster* v. *Higgins*, 6 Neb. 265, we refer for arguments which seem to us conclusive against the existence of such a lien. In some of the states it has been adopted by the courts and afterwards abolished by the legislature; and in others, although the courts have felt bound to follow earlier cases, it has of late years been done with expressions of regret that such liens were ever admitted in this country, where registration is so generally provided for and practiced.

In courts of the United States the doctrine has been recognized where established by the local laws

of different states (*Rice* v. *Rice*, 36 Fed. 858); but it
does not seem to have been looked upon with favor
if we may judge from the remarks of Mr. Chief
Justice MARSHALL in *Bayley* v. *Greenleaf*, 20 U. S.
(7 Wheat.), 51, that "it is a secret invisible trust,
known only to the vendor and vendee, and to those
to whom it may be communicated in fact. To the
world the vendee appears to hold the estate, divested
of any trust whatever; and credit is given to him,
in the confidence that the property is his own; in
equity as well as law. A vendor relying upon this
lien ought to reduce it to a mortgage, so as to give
notice to the world. If he does not, he is, in some
degree, accessory to a fraud, committed on the
public, by an act which exhibits the vendee as a
complete owner of an estate on which he claims a
secret lien." The authorities pro and con are col-
lated in 28 Am. and Eng. Ency. of Law, 163; 3
Pomeroy's Equity Jurisprudence, § 1251; 2 Jones on
Liens, § 1061; 1 Beach on Modern Equity Juris-
prudence, §§ 296, 297, and note to *Mackreth* v.
*Symmons*, 1 Leading Cases in Equity, 447, and we
think an examination of them and the discussion
of the question by the several authors will clearly
show that the whole doctrine is inconsistent with
the general policy prevailing in this country of
making all matters of title dependent upon rec-
ord evidence, so that interested parties may know
whether the land is encumbered by lien with-
out waiting for the judgment of a court, as is
admittedly the case in many instances where a
grantor's lien exists; that it bristles with difficulties,

snares, and dangers, and ought not to find lodgment
in this state, where its only effect would be to ren-
der the title to real estate uncertain, embarrass its
alienation, foster litigation, and offer temptation to
fraud and perjury, with no substantial benefit to
any one except to protect some grantor from the
consequences of his own voluntary act. The decided
tendency of modern legislation and legal learning is
clearly against the existence of such a lien under
any circumstances. Mr. Pomeroy ventures the opin-
ion "that the original grounds and reasons for ad-
mitting the grantor's lien do not exist in our own
country, and the lien itself is not in harmony with
our general real property law. The tendency both
of our legislation and of our social customs is to
make land a subject of commerce, and its transmis-
sion as free as possible; while the rights of grantors
can be fully protected by mortgages which, in
nearly all the states, are widely different from the in-
strument bearing the same name in England": 3 Pom-
eroy's Equity Jurisprudence, note to section 1250.
And Mr. Jones says that "It is to be noticed that,
within a few years, several states have abolished this
implied lien, and that strong expressions of disappro-
bation of the doctrine have been used in others.
Moreover, the practical tendency in the older states is
to rely upon formal instruments for security when
security is wanted. It may be doubted, therefore,
whether this doctrine will long survive": 2 Jones on
Liens, note to section 1063. And the learned editors
of the Leading Cases in Equity, upon an exhaustive
review of the authorities, conclude that "there can

be little doubt this principle of an implied lien for
purchase-money has no just application in a coun-
try where every debt may be at once made a lien
by judgment, and where debts generally are a lien
on the lands of decedents; and that the courts of
those states which have wholly expelled the doc-
trine have exhibited a more accurate appreciation
of its nature and purpose, than those which have
retained it": 1 Lead. Cas. in Eq. 502. The doctrine
may have been less objectionable in a country
where land was not liable for the contract debts of
the owner although incurred in its purchase, and
where the policy of the law was to discourage the
alienation of real estate. But we are satisfied that
it is repugnant to the registration law and general
policy of this state, and is no part of our law. The
decree of the court below will be affirmed.

AFFIRMED.