LEWIS G. DUNTON, EXECUTOR OF THE LAST WILL OF CHAUNCEY CURTISS, v. SARAH OUTHOUSE AND WILLIAM SCOTT.

*Vendor and vendee—Lien for purchase price—Pleading—Fraud.*

1. A vendor of land who has taken no security, although he has made an absolute deed and acknowledged the receipt of the purchase price, retains an *equitable* lien therefor, in the absence of its express or implied waiver, enforcible in equity against the vendee, and all other persons except *bona fide* purchasers without notice. This equity arises independent of contract, and it is therefore immaterial that the seller had no *intention* to reserve such lien; and if the purchaser alleges its non-existence, for any reason, in a particular case, the burden is on him to show the circumstances which repel the contrary presumption or rebut the equity.

2. A vendor seeking to enforce his lien must allege in his bill the contract of sale with *reasonable* certainty, and the *consideration* and *terms of payment*, which must be *clearly* proven; otherwise the court has no *data* for the enforcement of the lien. *Mowrey v. Vandling*, 9 Mich. 39.

3. Where in a suit to enforce a vendor's lien it appeared from the whole testimony that the land was conveyed to the complainant by his son-in-law, without consideration, and by him to his daughter, all for the purpose of placing it beyond the reach of the husband's creditors,—

*Held*, that, under such circumstances, the complainant had no lien enforcible in equity. *Palmer v. Sterling*, 41 Mich. 220.

4. A person cannot become a purchaser by a transaction of which he is wholly ignorant, nor can there be, as against him, a vendor's lien for a purchase price which he never agreed to pay. *Weare v. Linnell*, 29 Mich. 226.

Appeal from Kent. (Montgomery, J.) Argued November 16 and 17, 1886. Decided January 20, 1887.

Bill to declare and enforce a vendor's lien. Defendant Sarah Outhouse appeals. Decree reversed and bill dismissed. The facts are stated in the opinion.

*Norris & Uhl,* for complainant:

Appellant obtained a deed of the farm from her father for the price of her husband's indebtedness to him, which was to be paid, at all events, some time, which time might have been fixed by the mortgage to be given by her, which she refused to execute; hence the purchase price became immediately due and payable upon the delivery of the deed: *Merrill v. Allen,* 38 Mich. 487; *Williams v. Rice,* 60 Id. 102.

The fraudulent contrivance on the part of appellant, and her abuse of the confidence of an aged father reposed in herself and husband, as disclosed in the record, bring the case within the rule of *Merrill v. Allen,* 38 Mich. 487. See, also, *Bradley v. Bosley,* 1 Barb. Ch. 125; *Mills v. Bliss,* 55 N. Y. 139.

Complainant relied wholly on an unwritten claim against the land, "and therefore, as between grantor and grantee, the court will intend that the purchased estate was to be held for the unpaid purchase money:" *Hiscock v. Norton,* 42 Mich. 320.

Every transfer of land for an equivalent is a sale: *Huff v. Hall,* 56 Mich. 456; *Huff v. Olmstead,* 67 Iowa, 598 (25 N. W. Rep. 784).

Where the contract is between the vendor and the husband of the grantee, the taking of the husband's note does not invalidate the lien (1 Jones, Mort. § 205); and where the vendor agrees to receive a mortgage, the lien is not waived until the security is actually given (Id. § 209).

*William E. Grove,* for appellant:

The proofs do not sustain the case made by the bill, on which complainant must stand or fall: *Converse v. Blumrich,* 14 Mich. 109; *Kelly v. Kelly,* 54 Id. 30.

The case made by the proofs does not establish a vendor's lien, because there was no sale, no fixed price, no agreed consideration payable as the purchase price, nor any debt created simultaneously with the alleged sale, which was a part of the transaction: *Palmer v. Sterling,* 41 Mich. 220, 221.

The bill, regarded as one in the nature of a bill for the specific performance of a contract, based upon appellant's refusal to perform an oral agreement to execute such security, is not sustained by the proofs, because no mortgage was ever prepared or presented to her for execution, nor was she ever requested to give a mortgage. No amount was ever agreed upon to be secured by such mortgage, and no time of

payment nor rate of interest was fixed; hence a decree for performance cannot be made without first making a contract for the parties, which the court cannot do: *Mowrey v. Vandling*, 9 Mich. 39; *McClintock v. Laing*, 22 Id. 212.

CHAMPLIN, J. The bill of complaint in this cause was filed by Chauncey Curtiss, since deceased, in which he stated that on and prior to January 19, 1884, he was seized and possessed in his own right, in fee simple, of lands situated in the county of Kent and State of Michigan, described as follows: Lots 1 and 2 of block 1 of Canton Smith's addition to the city of Grand Rapids, also the south-east quarter of the north-west quarter, and the west half of the north-east quarter, of section 11, township 8 north, range 11 west, excepting 20 acres off from the north end of said west half of the north-east quarter.

That on said nineteenth day of January, 1884, he agreed to sell to Sarah Outhouse, upon the terms and conditions hereinafter expressed, the aforesaid lands and premises for the purchase price of $4,637.50, and she, in consideration thereof, agreed to make, execute, and deliver, immediately upon the delivery of the deed by him to her, a mortgage upon the aforesaid premises, except lots 1 and 2, to secure to him the payment of the aforesaid purchase money, *and pay the same*, and in pursuance thereof he did, by deed bearing date the nineteenth day of January, 1884, duly executed and delivered to said Sarah Outhouse, convey said premises to her, and thereafter, on the twenty-ninth day of September, 1884, she caused the deed to be recorded in the office of the register of deeds of Kent county, in Liber 157 of Deeds, at page 437.

That she has not, nor any one in her behalf, paid him the said sum of $4,637.50, the purchase price of the premises, nor any part thereof, and the same remains due and unpaid, and that she has, at all times since the execution of said deed by him, refused and neglected, and still refuses and neglects, to pay him the purchase money aforesaid, and still refuses to

execute and deliver to him a mortgage upon said lands as security for the payment of the purchase price in pursuance of her said agreement so to do.

That he is advised that the purchase price is a legal and equitable lien upon the aforesaid premises; and avers that, since the execution and delivery of the deed, the defendant Sarah Outhouse has, in fraud of his rights, executed a mortgage upon the said premises to one William Scott, as security for the payment of the sum of $1,000.

The bill prays that the purchase money, $4,637.50, may be declared a lien on said lands in favor of the complainant, namely, upon lots 1 and 2 of block 1 of Canton Smith's addition to the city of Grand Rapids, also the southeast quarter of the north-west quarter, and the west half of the north-east quarter, of section 11, township 8 north, range 11 west, excepting 20 acres off from the north end of said west half of the north-east quarter of section 11, to secure the payment of the purchase money and interest; and that Sarah Outhouse be decreed to pay complainant $4,637.50, with interest from January 19, 1884, on a near day to be fixed by the court, and, in default thereof, she, and all persons claiming under her by conveyance or otherwise; be barred and foreclosed of and from all equity of redemption, and for a sale of the premises to satisfy the amount found due; and that she be decreed to pay the balance or deficiency, if any exists, on such sale.

The defendants answered separately, the defendant Scott by plea claiming to be an innocent mortgagee in good faith; and this fact was admitted by the record, and a decree entered in his favor for costs.

The defendant Sarah Outhouse admits that complainant was the owner in fee simple, and was seized and possessed of his own right, of the lands and premises described in the bill of complaint; denies that on the nineteenth of January, 1884, or at any other time, upon the agreements or condi-

tions expressed in the bill of complaint, he agreed to sell to her the said lands for the purchase price of $4,637.50; and denies that she then and there, or at any other time, agreed to make, execute, and deliver, immediately upon the execution and delivery of the deed, or at any other time, a mortgage upon said lands, except lots 1 and 2 aforesaid; denies that she ever in any manner agreed to pay the same, or any part thereof; admits the execution and delivery of the deed to her, and the recording thereof, but denies that complainant conveyed said premises to her in pursuance of the alleged agreement set forth in the bill of complaint, and denies that complainant has a legal or equitable lien upon the premises for the alleged purchase price. She admits the mortgage to Scott, but denies that it covers lots 1 and 2, and denies that it was executed in fraud of complainant's rights.

She then sets out that said Chauncey Curtiss is her father and in the eighty-ninth year of his age; that the deed to her by him was made partly as a gift, and partly in consideration of care and nursing bestowed upon her mother, board and washing, mending and work, done for her father, and to place her upon an equal footing with her brothers and sisters, whom her father had assisted; that no money consideration was mentioned or talked of, and no mention was made of any payment or mortgage security therefor.

" She avers that said complainant never claimed payment from this defendant for said lands and premises, nor ever mentioned the subject of payment by her, nor any mortgage to be given by her upon said lands and premises, until about the twenty-second day of September, 1884, when he told her he wanted a mortgage on the farm, meaning the lands and premises aforesaid except said two lots, but did not state any amount; that this defendant then told him that she would not give any mortgage, as the understanding between them was that she should have the property clear; that said complainant said nothing more at that time upon that subject, but returned a week later, and asked this defendant if she was going to give him a mortgage on that farm; that this defendant answered him, ' No,' and told him again that the

understanding was that she was to have the property free and clear, and that, if she couldn't have it so, she would give him back the deed if he wanted it. Complainant replied: 'No; you keep it. Keep what you have. There is a certain one who wants to ruin your husband.' This defendant then told him that she would either put the deed upon record or return it to him, and complainant again replied, 'Keep it, and put it on record,' and then went away, parting with this defendant in a most friendly and satisfied manner, and never again, directly or indirectly, referred to the matter to this defendant prior to the commencement of this suit.

"This defendant, further answering, states that sometime last spring, or in the early part of summer, she informed complainant that she had been trying to negotiate a loan upon said lots 1 and 2 for the purpose of erecting a building thereon, and complainant then offered to loan her the money, and take security for the same on said lots, and did from time to time, as her work of building progressed, loan her such sums as she required, until about the completion of said building, when he settled with this defendant the amount so loaned, and took her mortgage upon said lots for the aggregate so loaned, namely, the sum of $1,120, and did not set up any claim of lien upon said lands at any time, on any of their meetings, in regard to said loan, or the mortgage given to secure the same, but during the whole time treated this defendant as the absolute owner thereof; and that said complainant has never, prior to the commencement of this suit, made any mention to this defendant of any other mortgage upon said premises, except, as hereinbefore stated, at the two interviews in September, 1884; and this defendant positively avers that the conveyance to her of said premises by said complainant was not upon nor for any other consideration than that hereinbefore stated and averred."

The cause was heard upon pleadings and proofs, and a decree entered therein that Chauncey Curtiss, in his life-time, and on the nineteenth of January, 1884, agreed to and with the defendant Sarah Outhouse to sell and convey to her the south-east quarter of the north-west quarter, and the west half of the north-east quarter, of section 11, except 20 acres off of the north end, in the township of Plainfield, Kent county, Michigan, and also lots numbered 1 and 2 of Canton Smith's addition to the city of Grand Rapids, in said county,

for the price of $2,785.15, to be paid by her to him upon the execution of a good and sufficient deed by Chauncey Curtiss to her, and that she agreed to pay him the said sum of $2,-785.15 therefor; that he executed such conveyance on that day, and she did not pay the purchase money, and has not paid it, but refuses to do so; that complainant had no other security therefor than a vendor's lien, which it was decreed he had, and unless the said purchase price was paid by the fifteenth day of August, 1886, the premises, or so much thereof as should be necessary, should be sold to raise the said amount; that the premises on section 11 be first sold; and that defendant, and all persons claiming or to claim from and under her, be forever barred from all equity of redemption in the premises sold.

The vendor's lien upon sale of real estate has always been recognized in this State; the earliest reported case being that of *Carroll v. Van Rensselaer*, Harr. Ch. 225. The doctrine, generally stated, is that the vendor of land who has taken no security, although he has made an absolute deed and acknowledged the receipt of the purchase price, yet retains an equitable lien for the purchase money, unless there be an express or implied waiver and discharge of it, which will be enforced in equity against the vendee, volunteers, and all others claiming under him with notice; that is, against all persons except *bona fide* purchasers without notice.

The equity arises independent of contract, and it is therefore immaterial that the seller had no intention to reserve such a lien. 2 Sugd. Vend. & P. 675. And if the purchaser alleges that the lien does not exist, for any reason, in a particular case, the burden is on him to show the circumstances which repel the presumption of its existence or rebut the equity. 4 Kent, Com. 152; *Garson v. Green*, 1 Johns. Ch. 308; *Gilman v. Brown*, 1 Mason, 191, 213, 214; *Schnebly v. Ragan*, 7 Gill & J. 120, 125; *Tompkins v. Mitchell*, 2 Rand. 428, 429; *Allen v. Bennett*, 8 Smedes & M. 672, 681; *Camp-*

*bell* v. *Baldwin*, 2 Humph. 248, 258; *Manly* v. *Slason*, 21 Vt. 271.

But when a vendor resorts to a court of equity to declare and enforce his lien, it is necessary that he allege the contract of sale with reasonable certainty, and that the consideration and terms of payment must be alleged and clearly proven; otherwise the court has no *data* for the enforcement of the lien. *Mowrey* v. *Vandling*, 9 Mich. 39.

The bill in this case alleges a sale to the defendant Sarah Outhouse, for the purchase price of $4,637.50, on the nineteenth of January, A. D. 1884, and that a mortgage was to be executed by her immediately upon the execution of the deed; but no time or terms of payment are stated or set forth in the bill of complaint. The proof fails entirely to substantiate the claim made by the bill that the purchase price agreed upon was $4,637.50. Complainant testifies that it was to be the amount of indebtedness due him from George H. Outhouse, which he testifies was $3,953.15, and the amount found by the decree of the circuit court was $2,-785.15. Complainant's counsel has made and presented a computation, based upon the testimony, from which he claims that the purchase price was $3,137.

The statements contained in the bill and answer afford no information of what the transaction between the parties really was, as developed by the testimony. The principal witnesses were the complainant, Chauncey Curtiss, the defendant Sarah Outhouse, and her husband, George H. Outhouse. It appears that in 1873 George H. Outhouse gave to Chauncey Curtiss a mortgage upon 80 acres of land to secure the payment, in four years, of $1,750, with interest at 10 per cent., being for part of the purchase money of the premises mortgaged; that subsequently Mr. Outhouse purchased 20 acres more of land adjoining, and lots 1 and 2, block 1, of Canton Smith's addition to the city of Grand Rapids, all of which he owned on the nineteenth of January,

1884; that on that day, by a deed bearing date the first day of January, 1884, but executed and delivered the nineteenth of January, Outhouse and his wife, Sarah, conveyed the lands known as the farm in Plainfield to Curtiss. Upon 80 acres of this farm, as before stated, Curtiss held a mortgage for the purchase price executed by Outhouse, and the conveyance by deed from Outhouse and wife to Curtiss covenanted that the lands were free from incumbrance, except this mortgage. By another deed, executed the same day, Outhouse and wife conveyed the two lots upon Canton Smith's addition to Curtiss. These deeds were placed upon record immediately. On the same day Curtiss executed and delivered to Sarah Outhouse a deed of the land covered by both deeds to him. This deed was in effect a quitclaim, containing a covenant simply against his own acts.

Mr. Curtiss, a witness in his own behalf, testified to the transaction substantially as follows:

"George came to me, and he says that he got into a little trouble, being in company with my son James. He says there is 20 acres on the west side of the road, not in my mortgage, and he said they were going to put onto him for James' individual debts,—he signed a note, I think, for a wagon, I think, and some other things,—and that they would make him pay. He signed it as company, and he had no concern in it. 'Now,' said he 'I want you to transfer that over, and, if there is anything left for Sarah, to save it for her.' I said: 'I am not going to undertake to cheat anybody at all. If I can have my pay, that is all I want.' He said: 'You give me a deed of the place,—give her a deed of the place,—and she will give you a mortgage back.'"

That he (Outhouse) was to give him a deed, and he was to give her a deed; that the deeds were to be both alike, but that he now finds that the deed from him to Sarah Outhouse makes no mention of the mortgage, which it should have done; that the agreement was that she should give him a mortgage back for the amount that was due from Mr. Outhouse to him; that the reason why the mortgage was not

executed at the time was, Mr. Outhouse wanted to sell his place, and he agreed to wait until he had a chance to sell it; that there was no figuring up to ascertain the amount that was due him at this time, and Outhouse agreed that he would not put the deed upon record until after they had settled up; that he waited about six months, and they did not settle, and he urged them to give him a mortgage, and finally, upon a Friday, he told them it must be settled before the next Tuesday, and in the meantime they put the deed on record; that his whole talk about deeding the place to Sarah Outhouse, and taking back a mortgage, was with George H. Outhouse; that he never had any talk with Sarah about deeding the place to her, and he does not remember that he ever said anything to Sarah about her giving him a mortgage.   He testified:

"I had a mortgage.  When I bought the place there was 80 acres east of the street, and 20 west; that made my 100 acres that I bought.   Mr. Dunton sold 20 acres to Mr. Childs; he bought 20 acres that did not come into my deed.   And Mr. Outhouse, when he bought it, Mr. Dunton deeded it to him, —them 20 acres that I didn't have a mortgage on; and Mr. Outhouse says to me,—George Outhouse says:  'There is 20 acres there that they will put onto me to pay Jim Curtiss' debts,—company debts,—and I had no concern in it;' and he wanted to secure that away, so that they would not get it away from him for nothing."

That the property upon which he was to have security was the 100 acres.   It was to cover nothing but the farm.   He testified, further, that, in addition to the mortgage debt which he held against George H. Outhouse, he (Outhouse) agreed to secure him for a debt which was formerly represented by a note signed by one Loomis, which Curtiss had bought of one Housel, and which Curtiss had let Outhouse have to use in a purchase of property which he and James Curtiss made from Loomis.   The note was dated March 27, 1872, for $400, and interest at 10 per cent.   He also testified that after the deed was given—but the date he is unable to

tell—Mr. Outhouse figured up the amount he owed him, and he (Curtiss) made a memorandum of it, and at that time the mortgage amounted to $3,500, and the Loomis note to $453.15. He says that there was no note or other personal obligation for the sum secured by the mortgage from Outhouse to him; that at the time the deed was executed they had not reckoned up; that it was their agreement that the deed that he gave her was not to be put upon record until they had reckoned up; that there was nothing said how long the mortgage was to run, nor the rate of interest it should bear, nor whether it was to be paid in one or more installments; that Mr. Outhouse did the whole business; that Outhouse did not tell him that he was acting for Mrs. Outhouse, neither did she tell him so in particular, but she acquiesced in everything that was done.

*Question by Mr. Uhl.* "You say the mortgage she was to give was to include the 20 acres as well as the other land?

"*A.* He said he wanted to save that 20 acres for her to keep from paying unjust debts.

"*Q.* So that the mortgage was to cover the land that was in your old mortgage, and the 20 acres?

"*A.* Yes, sir."

The above is substantially the version of the transaction as given by Mr. Curtiss. He was, at the time his testimony was taken, about 87 years of age, and his evidence shows that his memory was somewhat weak and defective, but, considering his advanced age, it was remarkably clear and retentive. There is no intimation that his intellect was enfeebled to that degree that he was not fully capable of transacting business, nor is it claimed that any fraud or unfair advantage was practiced upon or taken of him in the transaction narrated.

What plainly appears from his testimony is this: His son-in-law, Mr. Outhouse, was the owner of 100 acres of land in Plainfield, and two lots in the city of Grand Rapids. The two city lots and 20 acres of the Plainfield farm were unincumbered, and 80 acres were incumbered by a mortgage held

by complainant. The son-in-law became embarrassed, and, in order to place his property beyond the reach of his creditors, he gave a deed of the lands, without consideration, to his father-in-law, and he, without consideration, conveyed the same lands to his daughter, the wife of his grantor. He now asks that he may have a vendor's lien declared and enforced in his favor for the amount of indebtedness from the son-in-law to him at the time of the transfer.

The transaction was tainted with fraud, and, under such circumstances, courts of equity leave the parties where they have voluntarily placed themselves. Nor is the transaction relieved of its fraudulent character by the claim that the purpose was to evade the payment of an unjust debt, in which the son-in-law claimed to have no concern. Such claim is always made by a failing debtor as an opiate to quiet the conscience for committing the wrongful act.

The testimony in the record shows that, after the deeds were made, creditors levied upon the property, or portions of it, as the property of Mr. Outhouse; and, if this case was a proper one for the enforcement of a vendor's lien, it would be a question requiring consideration whether such creditors should not have been made parties, and how far their rights would be affected in a proceeding to enforce such lien.

There are other difficulties in the way of supporting the decree made in the court below arising upon the case as made by the complainant's proofs. The bill of complaint asserts that Sarah Outhouse agreed to pay the purchase price of $4,-637.50, and asks for a personal decree against her. Complainant shows by his proof that she never agreed to pay such purchase price, or any price, for the land conveyed; that there was no agreement made with Outhouse that he should be discharged from his obligation to pay the debt which he owed to Curtiss, and that his wife should assume it or become liable for it. The bill asks, and the decree grants, this result; but it is entirely unsupported by the proofs.

The bill also states that the agreement was that the purchase price should be secured upon the 100 acres of land, and the city lots were not to be included in the mortgage. Yet it prays, and the decree grants, a lien for the purchase price upon both the city lots and the 100 acres. This is also entirely unsupported by any proof in the case. The testimony of the complainant, Curtiss, shows that after the execution of this deed he loaned his daughter, Sarah Outhouse, from time to time, during the year 1884, and before the commencement of this suit, sums of money to build upon these lots, and that he took from her a mortgage to secure the sum of $1,120, so borrowed, covering these city lots; and this he did without making any claim that he had a lien thereon for the purchase price. These circumstances, taken in connection with the others attending the transaction out of which the conveyance to her was made, strongly repel the inference that a vendor's lien exists in favor of complainant, Curtiss.

Sarah Outhouse was produced as a witness in her own behalf, and gave her version of the affair as follows: That Mr. Curtiss came to her house, and asked her if she knew of a note being given by her brother and signed with her husband's name without his knowledge and consent; that she told him she did, and he asked her what Mr. Outhouse would do about that, and she told him that she did not know; that he told her that he must not do anything about it; that he had reasons for protecting her brother. He told her then that she should have the deed of the place; that he would give her the deed of the place if she could make the bargain with her husband,—if she could persuade him in any way not to trouble Mr. James Curtiss; and the further consideration was what she had done for him and for her mother when they were living with her; "that she should have the deed of the place free and clear was the very words used." He said he had given to the older daughters, her three older sisters, and he had never given her anything; that he had helped

those three, and had not her; that he never mentioned anything about her giving him a mortgage on the farm, and she never agreed to give him one; that at the time the deed was given to her, or prior thereto, no money consideration was spoken of as to the price to be paid for the farm.

It quite plainly appears from her testimony that she and her husband fully understood the occasion and the reason for placing the title of the premises in question in her name; and I am satisfied that while, in one sense, she might understand that it was intended as a gift to her, yet she was quite well aware that it was a gift made at the expense of her husband's creditors, and for the purpose of placing the property beyond their reach. The explanation she makes of why the deed was to be kept off the records is not very satisfactory.

It is proper to say that Mr. Chauncey Curtiss was recalled, and denied positively the testimony of his daughter Sarah, and denied that he executed the deed with the intention of giving the farm to her. He again asserted that his agreement was made with Mr. Outhouse; and, as his testimony is given in a more connected manner than when he was first produced, I quote from his testimony. He was asked to state his conversation with Mr. Outhouse, and he testified:

" He came to me, and said that there was going to be some trouble about some land that has been testified to all over, and he wanted I should take a deed. It would not do, he said, for him to give a deed directly to her. Is that the law?

" Q. Never mind; just testify.

" A. He would give a deed of that 20 acres in addition. I had a mortgage on the land, all but the 20 acres; and he would give the deed to me, and I was to give the deed to her, and she was to give me a mortgage back on it; and, in regard to that, he requested me never to say a word to her about it; and she and I never had a word of conversation about it until we got into the buggy to come down and make out that deed; and we came down, and it was made out by that man.

I suppose he agreed to do it all so, and so I trusted him to do it.

"*Q.* Who do you mean by 'he?'

"*A.* Mr. Outhouse. He mentioned there was going to be trouble, and I told him I didn't know anything about it. I knew that there was trouble growing.

"*Q.* What conversation did you have with her, if any, the day that you came down to have the deed drawn, in the buggy?

"*A.* I don't remember that there was a single word said about it, only coming down to make out the writing. He agreed to do all this business, and she should give me a mortgage back, and I supposed it was all right; and I went in a number of times, and asked to have a settlement; and the last time—very nearly two years, I guess, I kept going; I wanted to settle up my business—on Friday, I went in. I said, 'Sarah, this must be settled up before Tuesday; I am not going to wait any longer.' She said once before that, 'Hadn't you as lief have the money as to have a mortgage?' —keeping me off, he was about selling it. I said, 'Yes.' I said, 'I will give you a deed back. You shall have it for $500 less than it amounts to if you will pay the money,'— because I had rather have what he owed me than the place by $500. I didn't want it. Once he could swap it away. He had a bargain made. He was going to take a place in the Rapids, up there, and I said, 'If you will take that place,— they asked him $1,500 to boot,—I will take that place off your hands, and allow you $1,600 on what you owe me.'

"*Q.* That was before Mr. Outhouse deeded it to you?

"*A.* Oh, yes; nearly a year."

Mr. Outhouse gives his version of the transaction, in answer to questions of counsel, as follows:

"*Q.* What was that agreement?

"*A.* That agreement was that I owed him, and I wanted to pay him. He wanted me to straighten it up, and I had got into a little trouble, and I told him I wanted to convey that farm to him, and also the lots; that I wanted him to hold the deed of the farm, and to convey the two lots to my wife.

"*Q.* Is that all? State the whole fully.

"*A.* And I did convey the property to him. I gave him a deed of the farm; and also a deed of the two lots.

"*Q.* The same conveyance all in one deed?

64 MICH.—28.

"*A.* No, sir; separate deeds.

"*Q.* What was the consideration of the deed of the farm from you to him?

"*A.* I think—

"*Q.* Or what was the talk about that between you and him?

"*A.* I had always asked $4,500 for the farm, and I think that was the consideration.

"*Q.* What talk did you and he have?

"*A.* There was not any talk in regard to the value of the farm, only I told him—

"*Q.* What talk did you have about the entire transaction? How came you to deed it to him, and what was your talk about the whole transaction?

"*A.* I told him I wanted to deed him the farm and the two lots; and he says, 'There is more in the farm than is coming to me.' Well, I told him then he knew what he could do with it. I wanted him to deed the two lots to my wife.

"*Q.* Did you hear Chauncey Curtiss' testimony in this case?

"*A.* No, sir.

"*Q.* He has testified as follows: 'George came to me, and he says that he got into a little trouble, being in company with my son James. He says there is 20 acres on the west side of the road not in my mortgage, and he said they were going to put onto him for James' individual debt,—he signed a note, I think, for a wagon, 1 think, and some other things, —and that they would make him pay. He signed it as company, and he had no concern in it. "Now," said he, "I want you to transfer that over, and, if there is anything left for Sarah, to save it for her."' Do you remember any such conversation, in whole or in part?

"*A.* I told him that I had got into some trouble, and there was several notes out that I didn't want to pay; and I says, 'You want this straightened up now, and I will deed you that farm;' and he says, 'There is more in that farm than is coming to me.' I said, 'You know what you can do with it.' I said, 'You can fix that;' and I says, 'Furthermore, I want to deed you those lots, and I want you to deed those back to my wife, and you can keep the deed of the farm yourself.'"

The witness also testified that he was not aware that Mr. Curtiss had conveyed the whole property to his wife until

after it had been done, and nothing was ever said about giving a mortgage back, or by his wife, to secure the debt he owed Mr. Curtiss.

His testimony upon cross-examination is quite significant of the object and purpose of these conveyances. I quote from his testimony.

" *Q.* Who first spoke about your deeding this farm to him at the time you made the deed, in January, 1884?

" *A.* I think I did.

" *Q.* Where was the conversation?

" *A.* If I am not mistaken, I think he was riding down town with me in the buggy.

" *Q.* When was that?

" *A.* That was either in November of 1873, I think, or 1883. I get these dates a little mixed.

" *Q.* What did you say to him?

" *A.* I told him that I was getting in trouble, and I told him the whole circumstances.

" *Q.* Go on. I want to know what you told him.

" *A.* I told him that I wanted to deed him that farm, and I also wanted to deed him the two lots. At first he kind of shook his head, and didn't know, and I told him about it.

" *Q.* I don't ask you that. I ask you what you told him.

" *A.* I told him that I wanted to deed him those lots and the farm.

" *Q.* You said you told him the circumstances. Repeat what you told him.

" *A.* I told him that I wanted to deed him the farm, and I told him about that note, and I heard of one or two others the same—

" *Q.* What did you tell him?

" *A.* I says: 'You can take a deed of that farm, and hold it.'

" *Q.* You say you told him about that note. I ask you what you told him.

" *A.* I am trying to tell you.

" *Q.* You are not answering the question when you say you told him about the note. What I want you to do is to quit this, and do just as you were when you were talking to him, and tell us what you said to him. When you say, 'I told him about the note,' it don't answer my question. Go on and tell all you said to him.

" *A.* I told him that I wanted to deed him—give him a

deed of—the farm and the two lots; that is what I told him.

"*Q.* Is that all?

"*A.* And that I wanted he should deed the lots back to my wife.

"*Q.* Is that all?

"*A.* And I wanted him to hold or keep the deed himself; and he says: 'There is more in the farm than there is coming to me. What shall I do with it?' I said: 'You can fix that yourself; do just as you are a mind to.' Now, that was the conversation.

"*Q.* Was that all of it?

"*A.* That was about the substance of it.

"*Q.* Is that all you can now remember?

"*A.* It is all I remember now; then we talked about other things.

"*Q.* Is that all you now remember?

"*A.* All I remember now.

"*Q.* What did you mean a moment ago when you said you explained to him the circumstances?

"*A.* I was then referring to that note.

"*Q.* Let's have what you said to him about that note.

"*A.* I was telling him about what those notes were, and what those parties that held the note had said to me.

"*Q.* What did you tell him?

"*A.* I told him I should be sued on them, and they would levy on that 20 acres; and I says: 'Your mortgage does not cover the 20 acres, but I will have to pay somebody's else debts out of that 20 acres of land, and I don't want to.' That is the conversation that I told him.

"*Q.* You have said 'I told him about those notes.' I don't know what you mean by 'those notes.' What did you say to him about the notes?

"*A.* I told him there was some notes out, signed by the firm name of J. A. Curtiss & Co., that I had nothing to do with whatever; they were given for something else outside of the business.

"*Q.* What notes did you speak about?

"*A.* The Fitch note.

"*Q.* How much was that?

"*A.* I think $110 and something.

"*Q.* That was signed J. A. Curtiss & Co.?

"*A.* Yes.

"*Q.* Given by whom?

"*A.* Given by a man named Starr to J. O. Fitch, and indorsed by J. A. Curtiss & Co.

" *Q.* Who compose the firm of J. A. Curtiss & Co.?

" *A.* J. A. Curtiss and myself.

" *Q.* And you told him you wanted to convey that farm to him that the mortgage covered, and 20 acres you had that the mortgage did not cover, and those lots on South Division street?

" *A.* Yes, sir.

" *Q.* You say he shook his head. Why did he shake his head? What objection did he make?

" *A.* He didn't make any objection, only he just shook his head; that was all.

" *Q.* Didn't he say that he would not take any conveyance if there was anything wrong about it, or something of that kind?

" *A.* No.

" *Q.* You told him these notes were not for you to pay, didn't you?

" *A.* Yes, sir.

" *Q.* Were J. A. Curtiss & Co. embarrassed at that time?

" *A.* Yes, a little; I guess they were a little.

" *Q.* Afterwards a good deal, weren't they?

" *A.* Yes.

" *Q.* Was the farm levied on?

" *A.* It was after the transaction was made.

" *Q.* After the transaction,—after the deed was made to the complainant?

" *A.* Yes, sir.

" *Q.* It was not levied on, on a judgment rendered on any of these notes either, was it?

" *A.* No, sir.

" *Q.* What did he say when he shook his head?

" *A.* He didn't say anything.

" *Q.* When you made that proposition to him,—made that statement to him,—did he say he would not go into anything that would cheat anybody at all; if he could have his pay, that was all he wanted?

" *A.* No, sir; he didn't say any such thing to me.

" *Q.* Nothing of the kind said?

" *A.* No, sir."

From the whole testimony it is apparent that Outhouse conveyed the lands in question to his father-in-law, and he to Sarah Outhouse, to place them beyond the reach of the creditors of Outhouse; and, under such circumstances, the vendor has no lien that can be enforced in equity.

In *Palmer v. Sterling,* 41 Mich. 220, the facts indicated that the note put in evidence was dated back to the time of the sale of the land, and taken so as to furnish color to the transfer as a valid sale of land in case any trouble should arise as to creditors. The daughter in that case claimed that the deed was an unconditional gift. The Court said:

" All the authorities rest upon the basis that the land was actually sold for an agreed consideration, payable at all events, and payable as the purchase price. Unless there was a sale for a price, there could be no such relation as that of unpaid vendor and responsible purchaser. The lien can only exist as collateral to a debt which was a part of the transaction, and created simultaneously with the sale."

The authority of that case should dispose of this. Here was no agreed consideration, payable at all events, and payable as purchase price. The debt now claimed as purchase price, owing from a person other than the vendee, was not created simultaneously with the sale; and it was held in *Weare v. Linnell,* 29 Mich. 226, that,—

" A person cannot become a purchaser by a transaction of which he is wholly ignorant, nor can there be, as against him, a vendor's lien for a purchase price which he never agreed to pay."

The circumstances must indeed be exceptional that will create a vendor's lien against a vendee who has never agreed to pay any purchase money. I do not see how it can exist upon the complainant's testimony and proofs, relieving it of any intentional wrong-doing, and giving it the most favorable construction.

It was said upon the argument by defendants' counsel that the complainant was not remediless; that the mortgage given by Outhouse to Mr. Curtiss upon the 80 acres has never been discharged, and was not merged in the deed to Mr. Curtiss. The question is not before us upon this record, and calls for no discussion.

I think the decree of the circuit court should be reversed,

and the bill of complaint dismissed, with costs of both courts.

The other Justices concurred.